IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **Bucktown Station, LLC,** | Bankruptcy No. 11 B 02004 |
| Debtor. | |

FINDINGS OF FACT AND CONCLUSIONS OF
LAW ON MOTION OF PNC BANK NATIONAL
ASSOCIATION TO MODIFY STAY [Docket No. 69]

This case was filed by Debtor Bucktown Station LLC ("Bucktown") under Chapter 11 of the Bankruptcy Code, Title 11 U.S.C. In its petition, Debtor indicated therein that its case involves single asset real estate, putting this case on a fast time line under 11 U.S.C. § 362(d)(3). Creditor PNC Bank National Association ("PNC") filed its Motion to Modify Stay [Docket No. 69]. Trial commenced on the issues presented therein. Following trial, the parties submitted written closing arguments in the form of Proposed Findings of Fact and Conclusions of Law. The following will now stand as the Findings of Fact and Conclusions of Law following trial. For reasons discussed below, PNC's Motion will be conditionally denied by separate order.

## FINDINGS OF FACT

### 1. Debtor and its Property

Debtor is an Illinois limited liability company that owns and operates a condominium building located at the intersection of Western Avenue and Winnebago Avenue in the Bucktown neighborhood of Chicago, Illinois (the "Property"). Bruce Fogelson is Debtor's managing member, is the person in control of Debtor, and serves as the president of the condominium association. Fogelson has extensive experience developing real estate in the Bucktown neighborhood, including three other condominium buildings on the same block as Debtor's Property involved here.

The Property, which is Debtor's sole asset, is a triangular four-story mixed-use building. On the ground floor, there is a commercial condominium divided into three separate retail spaces, as well as a lobby for the residential condominiums. The remaining three floors each contain five residential condominiums, one each of five types. The "A," "C," and "D" units have three bedrooms and three bathrooms, the "E" units have three bedrooms and two-and-a-half bathrooms, and the "B" units have two bedrooms and two bathrooms. The Property also has twenty-three on-site parking spaces, four of which are tied to the commercial condominium. Fogelson, Debtor's principal, constructed and sold off units in a number of similar buildings through other companies before Debtor's Property was completed during 2009.

Debtor sold the three "B" units and three parking spaces in the Property as preconstruction sales. However, it has been unable to sell the remaining units, so they are currently leased to individual tenants. All unsold units are leased, generating a total monthly income of $30,490. All the commercial spaces and the four outdoor commercial parking spaces are also leased, generating an additional monthly income of $7,788. Debtor still owns twelve residential condominiums, sixteen parking spaces, and the commercial condominium. It intends to fund a reorganization plan using rental income and sale proceeds from selling units in the Property over time.

## 2. PNC's Loan and Other Secured Claims

Debtor's Property secures several claims totaling $5,771,902.24. The largest is PNC's claim. To finance development of the Property, Debtor obtained a loan from PNC secured by a note and mortgage in the Property. The parties have stipulated that PNC's claim on account of that loan, as of the date that Debtor filed its bankruptcy petition and exclusive of any possible claim for attorneys fees, is $5,382,277.36. PNC has also petitioned for awards of prepetition fees and costs of $48,608 and postpetition fees and costs of $91,342. Those petitions have been reserved pending resolution of PNC's Motion for Relief from Stay.

Several other entities assert mechanics lien claims against the Property. Debtor disputes several of these claims as duplicative and for other reasons.

For purposes of PNC's motion, Debtor and PNC stipulate that these claims total $305,815.88. In addition, the Property is subject to the Cook County Collector's claim of $83,809 for unpaid prepetition real estate taxes.

### 3. The Foreclosure Action

PNC made its loan to Debtor in November of 2006. Debtor did not repay the loan when it matured on November 10, 2008, so the loan was in default from that date. PNC eventually filed a foreclosure complaint against the Property in June of 2010.

### 4. Value of the Property

Both PNC and Debtor presented evidence of value through appraiser testimony and also through testimony of Debtor's principal. As detailed below, the finding of property value relies on all of the evidence.

#### A. PNC's Valuation and Adjustments

PNC's appraiser valued the Property at $3,520,000. This is the value he determined that an investor would pay for the Property "as is" with a goal of reselling the individual condominiums at a profit. To make this determination, he assumed sales of the individual condominiums over twenty-seven months, added in rental income, deducted costs of sale and maintenance, and discounted the cash flow to present value. He assumed that the residential condominiums would sell at an average of $404,000 and the retail condominiums would sell for $410,000. A table detailing the various assumptions and calculations that PNC's appraiser used is attached as Exhibit A.

There were some weaknesses in the methodology of PNC's appraiser that require some adjustments to be made to his opinion of value. Those are discussed below. However, except as otherwise noted below, the assumptions made by PNC's appraiser are accepted as appropriate.

First, PNC's appraiser assumed that some of the units in the retail condominium were vacant and would need to be leased in order to realize the Property's maximum potential rental income. In fact, Debtor has already signed leases with businesses to fill those vacancies, and the commercial condominium is now fully leased. The appraiser acknowledged that these new leases increased his estimate of the market value of the retail condominium to $610,000.

Second, the appraiser reported that the average rental income for the residential condominiums was $2,350 per month ($7,050 per quarter). In fact, the average rental amount is larger: $2,540 per month ($7,620 per quarter).

Third, the appraiser assumed that the monthly rental income from the retail condominium was $2,901 ($8,703 per quarter). However, the actual income from the commercial tenants was $7,788 per month ($23,364 per quarter).

Finally, the appraiser selected an inappropriate capitalization rate. The capitalization rate is a discount applied to net cash flows to convert projected income to present value. PNC's appraiser relied on a survey of capitalization rates from RealtyRates.com for condominiums and co-ops in the Great Lakes region. That survey includes profit in the rates, and it reported pro-forma capitalization rates for mixed-use primary residences ranging from 13.65% to 26.06%, with an average of 19.06%. PNC's appraiser ended up selecting a rate of 25%, based on the Property's "relatively higher price-points and risk for the market area." However, the appraiser did not detail in his report why this Property had higher than average risk, nor did he testify convincingly on that point. Therefore, the average rate of 19.06% is found to be the appropriate rate.

### B. Debtor's Valuation

Debtor proposed a questionable method for valuing the entire Property. Its real estate appraiser valued only four of the twelve residential condominiums, one of each type. (He valued Unit 3A at $525,000, 2C at $495,000, 4D at $440,000, and 4E at $460,000, for an average value of $480,000.) Debtor's principal officer testified that he projected that all similar units would sell for the same value and that all twelve of the residential condominiums together are therefore worth $5,760,000. However, Debtor's appraiser never looked at the other units in the building and offered no opinion as to their value. He never took any steps to aggregate value, to account for costs of sale or maintenance, to determine similar costs of ownership, or to calculate present value. When pressed, he expressly disavowed any opinion of the total value of the residential portion of the Property.

Debtor's own evidence as to the retail condominium is similarly unpersuasive. The only evidence Debtor presented was the testimony of its

principal, Bruce Fogelson, who is not an expert in real estate appraisal, even though he is very knowledgeable about the area and the market for very similar units sold by him through other companies shortly before the 2008 recession. He opined that the value of the retail condominium exceeded $1 million, based on what he thought he could sell it for in the current market. But Debtor did not provide any current market evidence corroborating his testimony.

### C. Finding of Value

While neither PNC nor Debtor has put forward an entirely creditable opinion of value, it is possible to determine an approximate range of the Property's value. The methodology used by PNC's appraiser more accurately captures the value that Debtor's Property might have if all the condominiums were to be sold off over time. Therefore, that methodology is adopted, albeit with the adjustments noted above.

However, each appraiser gave a credible opinion as to the average value of the individual residential condominiums. Both appraisers were well qualified to perform that analysis, both used a sales comparison approach, and both relied on sales of reasonably comparable properties. But each arrived at a different conclusion of average value of the residential units: PNC's appraiser at $404,000 and Debtor's at $480,000.

Using the adjusted methodology of PNC's appraiser and these average residential condominium values, the present market value of Debtor's Property is found to be between $4,030,000 and $4,690,000. Exhibits B and C to these Findings and Conclusions detail the calculations supporting this finding. A more precise calculation would give a false impression of certainty from the expert testimony. Expert appraisals are based on a recognized art, not science; and on experience, not a crystal ball.

### 5. Debtor's Plan

Debtor's proposed Plan provides for a staged sell off of the condominiums over a three-year period. Debtor assumes that it will sell the residential condominiums for an average of $475,000 each and the retail condominium at the very end of the Plan period for $825,000.

Under that Plan, the net sale proceeds will be used to repay Debtor's creditors. Secured creditors and unsecured creditors with claims under $4,000 are each to receive 100% of their allowed claims, while unsecured creditors with claims over $4,000 are each to receive 3% of their allowed claims. Debtor intends to challenge the amounts claimed by some mechanics lien creditors, so only their claims as expected to be allowed after that process are included in Debtor's projections.

## CONCLUSIONS OF LAW

### 1. Jurisdiction

Subject matter jurisdiction lies under 28 U.S.C. § 1334. This case is before the Court pursuant to 28 U.S.C. § 157 and is referred here by District Court Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. §§ 1408 and 1409. The issue now ruled on constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(G).

### 2. Although Debtor Has No Equity in its Property, PNC is Not Entitled to Relief from the Stay Because Debtor Has a Plan in Prospect

The filing of a bankruptcy petition operates as a broad stay against almost all acts against a debtor or property of the bankruptcy estate. 11 U.S.C. § 362(a). Among other things, a creditor may not commence or continue any judicial proceeding against a debtor or attempt to recover a claim against a debtor that arose before the commencement of the bankruptcy case. *Id.* § 362(a)(1). This automatic stay "is one of the fundamental debtor protections provided by the bankruptcy laws." H.R. Rep. No. 595, at 340 (1977). "It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." *Id.*

Under certain circumstances, however, a creditor may seek relief through the termination, annulment, modification, or conditioning of the stay. 11 U.S.C. § 362(d). One such circumstance is when the debtor does not have equity in property that is the creditor's security and that property is not necessary to an "effective reorganization." *Id.* § 362(d)(2). When a creditor

seeks relief from the stay on this ground, it bears the burden of showing that the debtor lacks equity in the property, while the debtor bears the burden on all other issues. *Id.* § 362(g).

### A. Debtor Lacks Equity in its Property

The parties have stipulated that the claims secured by the Property total $5,771,902.24. However, as discussed above in Part 4.C of the Findings of Fact, the present value of Debtor's Property is only in a range between $4,030,000 and $4,690,000. Even at the high end of this range, Debtor clearly has no equity in its Property.

### B. Debtor's Plan Shows a Reasonable Possibility of a Successful Reorganization

To meet its burden to show that property is necessary for an "effective reorganization," a debtor must show "that the property is essential for an effective reorganization *that is in prospect*. This means ... that there must be a 'reasonable possibility of a successful reorganization within a reasonable time.'" *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988) (emphasis in original) (*quoting In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 370-71 (5th Cir. 1987)).

Here, Debtor intends to fund a reorganization Plan by selling the remaining condominiums over a three-year period, using the sale proceeds to repay creditors over time. This is not an unusual reorganization, and it stands a reasonable chance of succeeding, depending on whether the assumptions and sale projections prove out.

Debtor's Plan assumes that the residential condominiums will sell at an average $475,000, a price within the range of possible values. Debtor also assumes that the retail condominium will sell for $825,000. While this is quite a bit more than the current value of $610,000 admitted to by PNC's appraiser, that anticipated sale price is not beyond the realm of possibility. As recently as October of 2009, PNC's own appraiser valued the retail condominium at $800,000. Debtor does not intend to sell that unit until the very end of its Plan period in late 2014. It is possible that the retail portion of the Property will appreciate in value significantly by then.

Should this Plan succeed and the proposed sales take place, Debtor will have generated $7,408,225.49 in revenue. Debtor projects that this will be enough to repay its creditors according to the Plan, to pay necessary expenses, and to maintain the Property throughout the Plan period.

There is some risk, however, that Debtor's hopes and expectations will not be met. The condominiums may sell for less than Debtor anticipates, and at a slower pace. The recession that grips our country and region may have that result. If that happens, there will be delay and risk to the secured creditors here. That risk should not fall entirely on the creditors, mainly PNC. Debtor could and should minimize this risk by including benchmarks in its Plan, with case dismissal as the penalty for failure to meet the benchmarks. That way, Debtor itself would bear the risk that the condominiums will sell more slowly and for less than Debtor projects.

## CONCLUSION

Although Debtor lacks equity in its Property, it has proposed a Plan showing a reasonable possibility of a successful reorganization if the market improves and prospective customers come back into the home market over three years. By separate order, PNC's motion for relief from stay will be denied, conditional on Debtor proposing a Plan that provides for case dismissal should specified benchmarks on times and amounts of sales at reasonable intervals not be met.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 17th day of August, 2011.

Exhibit A

## Calculation of Value by PNC's Appraiser

| Quarters from Date of Value | Variables | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Absorbtion for Residential Condo Units** | | | | | | | | | | | | |
| Sales per Month | | | | | 0.33 | 0.67 | 0.67 | 0.67 | 0.67 | 0.67 | 0.33 | |
| # Units Closed | | | | | 1 | 2 | 2 | 2 | 2 | 2 | 1 | 12 |
| Cumulative Units Closed | | | | | 1 | 3 | 5 | 7 | 9 | 11 | 12 | |
| # Units Unsold | | | 12 | 12 | 11 | 9 | 7 | 5 | 3 | 1 | | |
| Res. Condos & Extra Parking | 404,000 | | | | 404,000 | 808,000 | 808,000 | 808,000 | 808,000 | 808,000 | 404,000 | 4,848,000 |
| Appreciation | 3.00% | | | | | | | | | | 6,060 | 12,143 |
| Total Condo Sales | 12 | | | | 404,000 | 808,000 | 808,000 | 808,000 | 808,000 | 814,060 | 410,083 | 4,860,143 |
| Commercial Condo Sale | 410,000 | | | | 410,000 | | | | | | | 410,000 |
| Commercial Condo In-Place NOI | 8,703 | | 8,703 | 8,703 | 8,703 | | | | | | | 26,109 |
| Subtotal | | | 8,703 | 8,703 | 418,703 | | | | | | | 436,109 |
| Residential Condo Rentals | 7,050 | | 84,600 | 84,600 | 84,600 | 77,550 | | | | | | 331,350 |
| Appreciation | | | | | | | | | | | | |
| Total Condo Rentals | | | 84,600 | 84,600 | 84,600 | 77,550 | | | | | | 331,350 |
| **Gross Sellout & Rates** | | | 93,303 | 93,303 | 907,303 | 885,550 | 808,000 | 808,000 | 808,000 | 814,060 | 410,083 | 5,627,602 |
| **Expenses** | | | | | | | | | | | | |
| Maintenance for Apt. Rentals | 500 | | 6,500 | 6,045 | 6,090 | 5,625 | 5,152 | 5,190 | 5,229 | 5,268 | 2,654 | 24,260 |
| Fix-Up Costs for 12 Rentals | 2,500 | | | | 2,538 | 5,113 | 5,152 | | | | | 31,144 |
| Sales & Marketing | 5.00% | | | | 20,200 | 40,400 | 40,400 | 40,400 | 40,400 | 40,703 | 20,504 | 243,007 |
| G & A | 3,426 | | 44,538 | 41,420 | 41,731 | 38,540 | 31,769 | 24,895 | 17,915 | 10,830 | 3,637 | 255,275 |
| Closing Costs Per Sold Unit | 12,000 | | | | 12,181 | 24,544 | 24,728 | 24,914 | 25,100 | 25,289 | 12,739 | 149,495 |
| Total Expenses | | | 51,038 | 47,465 | 82,740 | 114,222 | 102,049 | 95,399 | 88,644 | 82,090 | 39,534 | 703,181 |
| Net Cash Flow | | | 42,265 | 45,838 | 824,563 | 771,328 | 705,951 | 712,601 | 719,356 | 731,970 | 370,549 | 4,924,421 |
| Present Value Factor (Quarterly) | 25.00% | | 0.9412 | 0.8858 | 0.8337 | 0.7847 | 0.7385 | 0.6951 | 0.6542 | 0.6157 | 0.5795 | |
| Present Value of Cash Flows | | | 39,779 | 40,604 | 687,444 | 605,234 | 521,351 | 495,305 | 470,588 | 450,673 | 214,726 | 3,525,704 |
| **Market Value** | | | | | | | | | | | | **$3,530,000** |

Note: These calculations appear on page 77 of PNC's Exhibit P. Some minor mathematical errors have been corrected.

Exhibit B

## Adjusted Calculation of Value (Low)

| Quarters from Date of Value | Variables | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Absorbtion for Residential Condo Units** | | | | | | | | | | | |
| Sales per Month | | | | 0.33 | 0.67 | 0.67 | 0.67 | 0.67 | 0.67 | 0.33 | |
| # Units Closed | | | | 1 | 2 | 2 | 2 | 2 | 2 | 1 | 12 |
| Cumulative Units Closed | | | | 1 | 3 | 5 | 7 | 9 | 11 | 12 | |
| # Units Unsold | | 12 | 12 | 11 | 9 | 7 | 5 | 3 | 1 | | |
| | | | | | | | | | | | |
| Res. Condos & Extra Parking | 404,000 | | | 404,000 | 808,000 | 808,000 | 808,000 | 808,000 | 808,000 | 404,000 | 4,848,000 |
| Appreciation | 3.00% | | | | | | | | 6,060 | 6,083 | 12,143 |
| Total Condo Sales | 12 | | | 404,000 | 808,000 | 808,000 | 808,000 | 808,000 | 814,060 | 410,083 | 4,860,143 |
| | | | | | | | | | | | |
| Commercial Condo Sale | 610,000 | | | 610,000 | | | | | | | 610,000 |
| Commercial Condo In-Place NOI | 23,364 | 23,364 | 23,364 | 23,364 | | | | | | | 70,092 |
| Subtotal | | 23,364 | 23,364 | 633,364 | | | | | | | 680,092 |
| | | | | | | | | | | | |
| Residential Condo Rentals | 7,620 | 91,440 | 91,440 | 84,600 | 77,550 | | | | | | 345,030 |
| Appreciation | | | | | | | | | | | |
| Total Condo Rentals | | 91,440 | 91,440 | 84,600 | 77,550 | | | | | | 345,030 |
| | | | | | | | | | | | |
| Gross Sellout & Rates | | 114,804 | 114,804 | 1,121,964 | 885,550 | 808,000 | 808,000 | 808,000 | 814,060 | 410,083 | 5,885,265 |
| | | | | | | | | | | | |
| **Expenses** | | | | | | | | | | | |
| Maintenance for Apt. Rentals | 500 | 6,500 | 6,045 | 6,090 | 5,625 | 5,152 | 5,190 | 5,229 | 5,268 | 2,654 | 24,260 |
| Fix-Up Costs for 12 Rentals | 2,500 | | | 2,538 | 5,113 | 5,113 | | | | | 31,144 |
| Sales & Marketing | 5.00% | | | 20,200 | 40,400 | 40,400 | 40,400 | 40,400 | 40,703 | 20,504 | 243,007 |
| G & A | 3,426 | 44,538 | 41,420 | 41,731 | 38,540 | 31,769 | 24,895 | 17,915 | 10,830 | 3,637 | 255,275 |
| Closing Costs Per Sold Unit | 12,000 | | | 12,181 | 24,544 | 24,728 | 24,914 | 25,100 | 25,289 | 12,739 | 149,495 |
| Total Expenses | | 51,038 | 47,465 | 82,740 | 114,222 | 102,049 | 95,399 | 88,644 | 82,090 | 39,534 | 703,181 |
| Net Cash Flow | | 63,766 | 67,339 | 1,039,224 | 771,328 | 705,951 | 712,601 | 719,356 | 731,970 | 370,549 | 5,182,084 |
| Present Value Factor (Quarterly) | 19.06% | 0.9545 | 0.9111 | 0.8697 | 0.8301 | 0.7924 | 0.7563 | 0.7219 | 0.6891 | 0.6577 | |
| Present Value of Cash Flows | | 60,866 | 61,353 | 903,775 | 640,286 | 559,363 | 538,951 | 519,314 | 504,387 | 243,725 | 4,032,019 |
| | | | | | | | | | | | |
| Market Value | | | | | | | | | | | $4,030,000 |

Note: Changes from Exhibit A in the "Variables" column are in bold and underlined.

Exhibit C

## Adjusted Calculation of Value (High)

| Quarters from Date of Value | Variables | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Absorbtion for Residential Condo Units** | | | | | | | | | | | |
| Sales per Month | | | | 0.33 | 0.67 | 0.67 | 0.67 | 0.67 | 0.67 | 0.33 | |
| # Units Closed | | | | 1 | 2 | 2 | 2 | 2 | 2 | 1 | 12 |
| Cumulative Units Closed | | | | 1 | 3 | 5 | 7 | 9 | 11 | 12 | |
| # Units Unsold | | 12 | 12 | 11 | 9 | 7 | 5 | 3 | 1 | | |
| Res. Condos & Extra Parking | 480,000 | | | 480,000 | 960,000 | 960,000 | 960,000 | 960,000 | 960,000 | 480,000 | 5,760,000 |
| Appreciation | 3.00% | | | | | | | | 6,060 | 6,083 | 12,143 |
| Total Condo Sales | 12 | | | 480,000 | 960,000 | 960,000 | 960,000 | 960,000 | 966,060 | 486,083 | 5,772,143 |
| Commercial Condo Sale | 610,000 | | | 610,000 | | | | | | | 610,000 |
| Commercial Condo In-Place NOI | 23,364 | 23,364 | 23,364 | 23,364 | | | | | | | 70,092 |
| Subtotal | | 23,364 | 23,364 | 633,364 | | | | | | | 680,092 |
| Residential Condo Rentals | 7,620 | 91,440 | 91,440 | 84,600 | 77,550 | | | | | | 345,030 |
| Appreciation | | | | | | | | | | | |
| Total Condo Rentals | | 91,440 | 91,440 | 84,600 | 77,550 | | | | | | 345,030 |
| Gross Sellout & Rates | | 114,804 | 114,804 | 1,197,964 | 1,037,550 | 960,000 | 960,000 | 960,000 | 966,060 | 486,083 | 6,797,265 |
| **Expenses** | | | | | | | | | | | |
| Maintenance for Apt. Rentals | 500 | 6,500 | 6,045 | 6,090 | 5,625 | 5,152 | 5,190 | 5,229 | 5,268 | 2,654 | 24,260 |
| Fix-Up Costs for 12 Rentals | 2,500 | | | 2,538 | 5,113 | | | | | | 31,144 |
| Sales & Marketing | 5.00% | | | 24,000 | 48,000 | 48,000 | 48,000 | 48,000 | 48,303 | 24,304 | 288,607 |
| G & A | 3,426 | 44,538 | 41,420 | 41,731 | 38,540 | 31,769 | 24,895 | 17,915 | 10,830 | 3,637 | 255,275 |
| Closing Costs Per Sold Unit | 12,000 | | | 12,181 | 24,544 | 24,728 | 24,914 | 25,100 | 25,289 | 12,739 | 149,495 |
| Total Expenses | | 51,038 | 47,465 | 86,540 | 121,822 | 109,649 | 102,999 | 96,244 | 89,690 | 43,334 | 748,781 |
| Net Cash Flow | 19.06% | 63,766 | 67,339 | 1,111,424 | 915,728 | 850,351 | 857,001 | 863,756 | 876,370 | 442,749 | 6,048,484 |
| Present Value Factor (Quarterly) | | 0.9545 | 0.9111 | 0.8697 | 0.8301 | 0.7924 | 0.7563 | 0.7219 | 0.6891 | 0.6577 | |
| Present Value of Cash Flows | | 60,866 | 61,353 | 966,565 | 760,154 | 673,778 | 648,163 | 623,559 | 603,890 | 291,213 | 4,689,541 |
| Market Value | | | | | | | | | | | $4,690,000 |

Note: Changes from Exhibit A in the "Variables" column are in bold and underlined.

Case No. 11 B 02004
In re: Bucktown Station, LLC
Updated: August 17, 2011

## CERTIFICATE OF SERVICE

I, Deborah Smith, certify that on August 17, 2011, I caused to be served copies of the foregoing FINDINGS OF FACT AND CONCLUSIONS OF LAW to the following by electronic service through the Court's CM/ECF system or regular U.S. mail:

_____
Deputy Clerk

## SERVICE LIST

### Electronic Service through CM/ECF System

Karen J Porter
Brett M Scheive
Porter Law Network
230 West Monroe
Suite 240
Chicago, IL 60606
Counsel for Debtor

Office of the U.S. Trustee, Region 11
219 S Dearborn St
Room 873
Chicago, IL 60604

James M Crowley
Francis J. Pendergast, III
John F Sullivan
Philip J Berenz
Crowley & Lamb, P.C.
350 N. LaSalle Street
Chicago, IL 60654
Counsel for PNC Bank National Association

Robert A Langendorf
134 N Lasalle Suite 1575
Chicago, IL 60606
Counsel for Bruce Fogelson

Scott R Clar
John H Redfield
Crane Heyman Simon Welch & Clar
135 S Lasalle Suite 3705
Chicago, IL 60603
Counsel for Sterling Renaissance North, LLC

Peter G Swan
Emalfarb Swan and Bain
440 Central Avenue
Highland Park, IL 6003
Counsel for Norman Mechanical, Inc.

Andrew Szot
Patzik Frank & Samotny Ltd
150 S Wacker Dr., Suite 1500
Chicago, IL 60035
Counsel for Triangle Decorating Company, LLC